DEVON M. JACOB, ESQUIRE
PA Bar Number: 89182
JACOB LITIGATION
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Lead Counsel for the Plaintiffs) (*Pro Hac Vice Pending*)

JASON G. DOWNS, ESQUIRE
MD Bar Number: 29575
DOWNS COLLINS PA
729 E. Pratt Street, Suite 560, Baltimore, MD 21202
410.462.4529 | Jason@downscollins.com
(Local Counsel for Plaintiffs)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND (Northern Division)

| | |
|---|---|
| **CHELSEA C. ELINE,**<br>**MEGAN A. BRYANT,**<br>**ROSE R. MACGREGOR,**<br>**CHRISTINE E. COLEMAN, and**<br>**ANGELA A. URBAN,**<br><div align="right">**Plaintiffs,**</div><br>**v.**<br><br>**TOWN OF OCEAN CITY, MARYLAND,**<br>**RICHARD W. MEEHAN,**<br>**JOSEPH J. THEOBALD, and**<br>**ROSS C. BUZZURO,**<br><div align="right">**Defendants.**</div> | **Civil Action No.:**<br><br>**District Judge:**<br><br><br>**CIVIL ACTION – LAW** |

## COMPLAINT

**AND NOW** come the Plaintiffs, Chelsea C. Eline, Megan A. Bryant, Rose R. MacGregor, Christine E. Coleman, and Angela A. Urban, by and through their undersigned counsel, DEVON M. JACOB, ESQUIRE, and the law firm of JACOB LITIGATION, INC., and aver as follows:

### I.     Introduction

In June of 2017, Ocean City, Maryland, passed an "emergency ordinance" specifically banning female bare-chestedness in public, while permitting male bare-chestedness.  This lawsuit seeks temporary and permanent injunctions precluding the enforcement of the ordinance.

This lawsuit is about confirming the *legal right* of women to be bare-chested, in public, in the same places that men are permitted to be bare-chested, for purposes other than breastfeeding.

1

This lawsuit seeks a declaration from the Federal District Court that the Town of Ocean City's Emergency Ordinance 2017-10, violates the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution, because the gender classification does not further an important government interest, but rather codifies longstanding discriminatory and sexist ideology in which women are viewed as inherently sexual objects without the agency[1] to decide when they are sexual and when they are not.

Notably, until 1936, it was illegal for men to bare their breasts in public in the United States.  In that year, Clark Gable appeared bare-chested in a movie, which prompted 42 men to stage a protest in Atlantic City, New Jersey, to assert their right to be bare-chested in public.  They were arrested, and each fined $2.00.  That same year, men in Westchester, New York, fought for the right to be bare-chested in public, and won.  Over the next several years, men across the country fought for, and won, the right to appear bare-chested in public. (*Nelson, Steven, "Topless Rights Movement Sees Equality on the Horizon," U.S. News and World Report, Aug. 26, 2015.*)

It is now considered normal for males to appear bare-chested in public, and the act is associated with power, strength and freedom. Witness the worldwide positive reaction to the bare-chested Tongan Taekwondo athlete, who, during the 2016 Rio Olympics, "shot to fame after he walked in the opening ceremony shirtless – completely smothered in baby oil.  The Olympian, part-time model and homeless youth counselor, who melted hearts all over the globe, strutted back through the Maracana Stadium wearing a traditional Tongan ta'ovala – a mat wrapped around the waist – and very little else on Sunday night, much to the delight of his fans." ("*Topless Tongan*

---

[1] The issue is one of *agency*, not *capacity*. Importantly, a person's capacity to decide relates solely to a person's actual physical or mental *ability* to make a decision. A person's agency to decide, however, refers to a person's *authority* or *legal right* to make a decision.

*Flagbearer Steals the Show at Rio Olympics Closing Ceremony Again,"* Angle News, Aug 22, 2016."

In 1986, in <u>Duvallon v. District of Columbia</u>, 515 A.2d 724 (1986), applying Maryland and British common law, the District of Columbia Court of Appeals held that an adult female baring her breasts in public does not constitute the crime of indecent exposure. That same year, in Rochester, New York, Ramona Santorelli and six other women removed their shirts in protest of gender inequality under New York's indecent exposure law.  They were arrested and convicted.

In 1992, however, in <u>People v. Santorelli</u>, 600 N.E.2d 232 (NY 1992), the NY Court of Appeals, the state's high court, ruled that it was lawful for women to be bare-chested, in public, in the State of New York, and reversed the convictions. Despite the <u>Santorelli</u> decision, as recently as 2013, arrests of bare-chested women were still being made in New York City. After having to settle four wrongful arrest lawsuits against the City, the New York City Police Department finally began a department-wide training program to stop its officers from arresting women for bare-chestedness.

In 2016, in <u>Free The Nipple - Fort Collins v. City of Fort Collins</u>, *infra,* and <u>Free The Nipple – Springfield Residents Promoting Equality, et al. v. City of Springfield, Missouri</u>, No. 6:15-cv-03467 (W.D.Mo.), federal district judges issued preliminary injunctions, precluding the enforcement of ordinances attempting to make female bare-chestedness illegal. Pennsylvania, Vermont, Maine, Ohio, North Carolina, Washington, Idaho and Oregon, as well as parts of Florida and Texas all recognize the right of females to be bare-chested, in public, in their respective states.

As detailed further below, the negative effects of the disparate social and legal treatment of the male and female breast in our society has been proven to contribute to feelings of body and gender shame in young girls and adult women, which has been further proven to negatively impact

their health, discourage breast feeding, and give rise to victim blaming, rape culture and bullying. Studies show children are not harmed by seeing female breasts.  Likewise, any claim that Ocean City might suffer financially if women are treated equally to men is not based in reality.  Many other thriving tourist destinations, resorts and cities in the United States allow women to go bare-chested.  Regardless, financial losses – real or perceived – do not justify violating the Equal Protection Clause of the Fourteenth Amendment.

## II.      **Jurisdiction and Venue**

1.      This action is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343, and 1367.

3.      Venue is proper in this Court, as all parties are located within the District of Maryland, and the cause of action arose in the District of Maryland.

## III.     **Parties**

4.      Plaintiff, Chelsea C. Eline, is an adult individual, who lives in Salisbury, Wicomico County, Maryland. Ms. Eline has used the alias "Chelsea Covington."

5.      Plaintiff, Megan A. Bryant, is an adult individual, who lives in Lothian, Anne Arundel, Maryland.

6.      Plaintiff, Rose R. MacGregor, is an adult individual, who lives in Salisbury, Wicomico County, Maryland.

7.      Plaintiff, Christine E. Coleman, is an adult individual, who lives in Long Island City, New York.

8.      Plaintiff, Angela A. Urban, is an adult individual, who lives in Pittsburgh, Pennsylvania.

9.      Defendant, Town of Ocean City, Maryland ("Ocean City"), is a town located in Worcester County, Maryland that was incorporated in 1880. The 2010 census data indicates that Ocean City is a small town (2010 census: 7,102). Ocean City has an address of 301 North Baltimore Ave., Ocean City, MD 21842.

10.     Defendant, Richard W. Meehan, is an adult individual, who, is the elected Mayor of the Town of Ocean City, Worcester County, Maryland. The Mayor has a business address of 301 North Baltimore Ave., Ocean City, MD 21842. Defendant, Meehan, is sued in his official and individual capacity.

11.     Defendant, Joseph J. Theobald, is an adult individual, who, is employed by the Town of Ocean City, Worcester County, Maryland, as the Emergency Services Director, who oversees the Ocean City Beach Patrol ("Beach Patrol"). The Beach Patrol has a business address of P.O. Box 158, Ocean City, Maryland 21843. Defendant, Theobald, is sued in his official and individual capacity.

12.     Defendant, Ross C. Buzzuro, is an adult individual, who, is employed by the Town of Ocean City, Worcester County, Maryland, as the Chief of Police, who oversees the Ocean City Police Department ("Police Department.") The Police Department has a business address of 6501 Coastal Highway, Ocean City, MD 21842. Defendant, Buzzuro, is sued in his official and individual capacity.

IV.     **United States: Institutionalized Discrimination Against Women**

13.     The United States has a long history of discriminating against women in all aspects of society:

- In 1777, all states passed laws that took away a woman's right to vote.

5

▪        In 1855, in <u>Missouri v. Celia, a Slave</u> (Circuit Court, Callaway County, MO), the Court determined that a woman, known only as "Celia, a female slave," was the property of her master, without a right to defend herself against a rape committed by her master. As such, the Court decided that the jury was not permitted to consider self-defense during Celia's criminal trial for killing her master in self-defense. Celia was found guilty, and hung.

▪        In 1868, the Fourteenth Amendment to the Federal Constitution was ratified, defining "citizens" and "voters" as "male."

▪        In 1870, the Fifteenth Amendment to the Federal Constitution was ratified, providing, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude" but was silent on the issue of gender.

▪        In 1872, in <u>Bradwell v. Illinois</u>, 83 U.S. 130, the U.S. Supreme Court held that the Privileges or Immunities Clause of the Fourteenth Amendment to the Federal Constitution did not include the right to practice a profession, so a state had the right to exclude a woman from the practice of law. Notably, in Justice Bradley's concurrence, he stated, "[t]he natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. . . . The paramount destiny and mission of women are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator." 83 U.S. 130, 142.

▪        In 1872, Susan B. Anthony attempted to vote in the presidential election in New York, when it was still unlawful for women to vote.  She was arrested, convicted, and fined. <u>See</u> http://www.pbs.org/stantonanthony/resources/index.html.

▪     In 1875, in <u>Minor v Happersett</u>, 88 U.S. 162 (1875), the U.S. Supreme Court held that the privileges and immunities clause did not preclude a state from prohibiting women from voting.

▪     In 1908, in <u>Muller v State of Oregon</u>, 208 U.S. 412 (1908), the U.S. Supreme Court upheld Oregon State's restrictions on the working hours of women (capped at 10 hours a day), pursuant to the state's interest in protecting women's health.

▪     In 1920, the Nineteenth Amendment to the Federal Constitution was ratified, which provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex. Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XIX.

▪     In 1924, in <u>Radice v. People of State of New York</u>, 264 U.S. 292 (1924), the United States Supreme Court upheld a New York law that prohibited waitresses from working the night shift, explaining,

> The language used by this court in <u>Muller v. Oregon</u>, 208 U.S. 412, 422, 28 S. Sup. Ct. 324, 327 (52 L. Ed. 551, 13 Ann. Cas. 957), in respect of the physical limitations of women, is applicable and controlling: "The limitations which this statute places upon her contractual powers, upon her right to agree with her employer as to the time she shall labor, are not imposed solely for her benefit, but also largely for the benefit of all. Many words cannot make this plainer. The two sexes differ in structure of body, in the functions to be performed by each, in the amount of physical strength, in the capacity for long-continued labor, particularly when done standing, the influence of vigorous health upon the future well-being of the race, the self- reliance which enables one to assert full rights, and in the capacity to maintain the struggle for subsistence. This difference justifies a difference in legislation and upholds that which is designed to compensate for some of the burdens which rest upon her."

▪     Up until the 1960s, some vestiges of the legal doctrine of coveture survived in some states, where "by marriage, the husband and wife are one person in law; that is the very

being or legal existence of the woman is suspended during the marriage." Blackstone, William. "Extracts from William Blackstone's Commentaries on the Laws of England 1765-1769."

▪ Prior to 1963, and passage of the Equal Pay Act, women did not enjoy a federal right guaranteeing them equal wages for equal work.

▪ Prior to 1969, and the case of <u>Bowe v. Colgate-Palmolive Company</u>, 416 F. 2d 711 (7th Cir.1969), it was lawful for companies to layoff women pursuant to a segregated seniority system based on gender, despite women being able to meet the same physical requirements as men; effectively preventing women from being employed in jobs that had historically been reserved for men only.

▪ Prior to 1974 and the case of <u>Cleveland Board of Education v. LaFleur,</u> 414 U.S. 632 (1974), it was lawful for states to require pregnant women to take maternity leave on the assumption that they were incapable of working in their physical condition.

▪ Prior to 1971, and the case of <u>Phillips v. Martin Marietta Corporation</u>, 400 U.S. 542 (1971), it was lawful for private employers to refuse to hire women who had pre-school children.

▪ Prior to 1971, and the case of <u>Reed v. Reed</u>, 404 U.S. 71 (1971), it was lawful for a state to prefer men over women as administrators of wills.

▪ Prior to 1975, and the case of <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975), it was lawful for states to exclude women from juries.

▪ Prior to 1978, and the Pregnancy Discrimination Act, women did not enjoy a federal right not to be discriminated against in employment based on pregnancy.

▪ In 1981, in <u>Rostker v. Goldberg</u>, 453 U.S. 57 (1981), the U.S. Supreme Court held that male only registration for the military draft was constitutional. Notably, in his

dissent, Justice Thurgood Marshall observed that the decision is based on "ancient canards about the proper role of women."

▪ Prior to 1981, and the case of <u>Kirchberg v. Feenstra</u>, 450 U.S. 455 (1981), it was lawful for a state to give sole legal control over marital property to the husband.

▪ Prior to 1984, and the case of <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609 (1984), it was lawful for all-male organizations (i.e., Jaycees, Kiwanis, Rotary, Lions, etc.) to deny membership based on gender.

▪ Prior to 1984, and the case of <u>Hishon v. King and Spaulding</u>, 467 U.S. 69 (1984), it was lawful for law firms to discriminate against women in their promotion of lawyers to partnership positions.

▪ It was not until 1991, and the case of <u>UAW v. Johnson Controls</u>, 499 U.S. 187 (1991), that it was unlawful for private employers to permit men, but not women, from working in potentially hazardous occupations.

▪ It was not until 1994, and the case of <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127 (1994), that making peremptory challenges during jury selection, based solely on a prospective juror's sex, was determined to be unlawful.

▪ In 1996, in the case of <u>United States v. Virginia</u>, 518 U.S. 515 (1996), the Court held that it was unlawful for the Virginia Military Institute to deny entry to women based on gender, noting that gender "may not be used . . . to create or perpetuate the legal, social, and economic inferiority of women."

14. In 2017, in <u>Sessions v. Morales-Santana</u>, 582 U.S.____(2017), the Supreme Court of the United States noted that historically, "the lawbooks of our Nation were rife with overbroad generalizations about the way men and women are[,]" citing:

■    <u>In re Goodell</u>, 39 Wis. 232, 245-246 (1875) (endorsing statutory ineligibility of women for admission to the bar because "[r]everence for all womanhood would suffer in the public spectacle of women . . . so engaged");

■    <u>Bradwell v. State</u>, 16 Wall. 130, 141 (1873) (concurring opinion) ("[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life . . . . The paramount destiny and mission of woman are to fulfil (sic) the noble and benign offices of wife and mother. This is the law of the Creator");

■    <u>Bailey v. State</u>, 215 Ark. 53, 61, 219 S.W.2d 424, 428 (1949) ("Criminal court trials often involve testimony of the foulest kind, and they sometimes require consideration of indecent conduct, the use of filthy and loathsome words, references to intimate sex relationships, and other elements that would prove humiliating, embarrassing and degrading to a lady");

■    <u>Hoyt v. Florida</u>, 368 U.S. 57, 62 (1961) (women are the "center of home and family life," therefore they can be relieved from the civic duty of jury service).

15.    This "attitude of 'romantic paternalism' . . . put women, not on a pedestal, but in a cage." <u>Sessions</u>, 582 U.S. (<u>citing</u> <u>Frontiero v. Richardson</u>, 411 U.S. 677, 684 (1973) (plurality opinion)).

## V.    **Ocean City, Maryland**

16.    On June 6, 2017, the Beach Patrol, advised all Beach Patrol employees, in writing, of the Beach Patrol's "official procedure" and "official Beach Patrol policy," "for topless females on the beaches of Ocean City." <u>See</u> Policy, **Exhibit 1.**

17.     The Beach Patrol's "policy" and "official procedure," provides, in relevant part, the

following:

> There has been a recent request to the Worcester County States Attorney by a
> woman who wants to be able to sunbath (sic) on the Ocean City beaches without a
> top. This woman has provided what she believes is legal justification for her to be
> allowed to sunbath (sic) and walk about our beaches topless. The States Attorney
> has requested the Maryland Attorney General to provide an opinion on this
> question. To date, that requested opinion has not been provided to the States
> Attorney. Until we get specific guidance from the States Attorney, the City Solicitor
> and the Mayor and Council, we will handle complaints about women going topless
> on our beaches in the following manner.
>
> We will document the complaint on a minor incident form (which requires an
> incident number from CAD) with information and particulars about the situation
> and the complainant's information. We will not approach the topless woman, even
> if requested to do so by the complainant or other beach patrons.
>
> *     *     *     *     *
>
> If at any time the complainant requests Ocean City Police Department response,
> then we will make that request on their behalf, through Ocean City
> Communications.

18.     On June 9, 2017, Defendants, Meehan and Ocean City, issued the following Press

Release on Ocean City's website:

> Ocean City Is Not a Topless Beach & Will Not Become A Topless Beach
>
> Ocean City, Maryland – (June 9, 2017): Despite many reports and social media
> posts, the Town of Ocean City is not a topless beach and will not become a topless
> beach, town officials pledge. The intent of the policy that is being reported on was
> strictly for our Beach Patrol employees. Lifeguards in Ocean City are expected to
> have their eyes on the ocean, as the safety of our swimmers is their first priority.
> The town's police department, on the other hand, will respond to calls from the
> Beach Patrol and complaints from our beach patrons, should any activity of
> toplessness occur.
>
> "The Mayor and City Council are unanimously opposed to women being topless on
> our beach or in any public area in Ocean City," stated Ocean City Mayor Rick
> Meehan. "While we respect Ms. Covington's desire to express what rights she
> believes she may have, Ocean City is a family resort and we intend to do whatever
> is within our ability to also protect the rights of those families that visit us each
> year."

This matter was brought to the town's attention when the Worcester County State's Attorney's Office received a request from a woman, Chelsea Covington, who believed it was her constitutional right to be bare-chested on Ocean City's beach. At that time, the State's Attorney reached out to the Maryland Attorney General's Office for an opinion on the matter, which the Town of Ocean City is still anxiously awaiting.

<u>See</u> Website Press Release, **Exhibit 2.**

19.     On June 9, 2017, Defendant, Ocean City, issued the following Press Release on

Ocean City's Facebook page:

Despite what is being circulated on social media, the Town of Ocean City is not a topless beach and will not become a topless beach. The intent of the policy that is being reported on was strictly for our Beach Patrol employees. We want our lifeguards to have their eyes on the ocean, as the safety of our swimmers is their first priority. Our police department, on the other hand, will respond to calls from the Beach Patrol and complaints from our beach patrons, should any activity of toplessness occur. We have received dozens of phone calls, read thousands of comments and answered numerous emails from our residents and visitors expressing their concerns. We assure you we share those concerns and intend to do whatever is necessary to prevent this from happening on our beach, or in any public area in Ocean City.

<u>See</u> Facebook Press Release, **Exhibit 3.**

20.     On June 10, 2017, at 12:00 PM, Defendants, Ocean City and Meehan, conducted a

"Special Meeting."

21.     The "Special Meeting" Agenda, contained one item of business to be conducted:

"First Reading – Ordinance to Amend Chapter 58, Entitled Offenses and Miscellaneous

Provisions, of the Code of the Town of Ocean City, Maryland (offenses involving public nudity

or state of nudity)." <u>See</u> Agenda, **Exhibit 4.**

22.     During the Special Meeting, Defendant Ocean City, with Defendant Meehan's

concurrence, adopted Emergency Ordinance 2017-10.

23.     Emergency Ordinance 2017-10, provides, in relevant part, the following:

ORDINANCE 2017-10

AN ORDINANCE TO AMEND CHAPTER 58, ENTITLED OFFENSES
AND MISCELLANEOUS PROVISIONS, OF THE CODE OF THE
TOWN OF OCEAN CITY, MARYLAND

NOW, THEREFORE, BE IT ENACTED AND ORDAINED BY THE
MAYOR AND CITY COUNCIL OF OCEAN CITY THAT CHAPTER 58,
ENTITLED OFFENSES AND MISCELLANEOUS PROVISIONS, OF THE
CODE OF THE TOWN OF OCEAN CITY, MARYLAND BE, AND IT IS
HEREBY AMENDED BY ADDING ARTICLE V, AS FOLLOWS:

ARTICLE V. OFFENSES INVOLVING PUBLIC NUDITY OR STATE
OF NUDITY

Division 1. Generally.

Sec. 58-191. Legislative Findings.

(a)     There is no constitutional right for an individual to appear in public
nude or in a state of nudity. It does not implicate either the First Amendment to the
United States Constitution, the right to privacy, or a protected liberty interest. It
lacks any communicated *value* that might call for First Amendment protection. Nor
does it implicate the right of privacy or the right to be alone: one does not have right
(sic) to impose one's lifestyle on others who have an equal right to be left alone.

(b)     Whatever personal right one has to be nude or in a state of nudity,
that right becomes subject to government interest and regulation when one seeks to
exercise it in public.

(c)     A gender-based distinction challenged under the equal protection
clause of the United States Constitution is gauged by an important governmental
interest that is substantially accomplished by the challenged discriminatory means.

(d)     Protecting the public sensibilities is an important governmental
interest based on an indisputable difference between the sexes. Further, a
prohibition against females baring their breasts in public, although not offensive to
everyone, is still seen by society as unpalatable.

(e)     The equal protection clause does not demand that things that are
different in fact be treated the same in law, nor that a government pretend there are
no physiological differences between men and women.

Sec. 58-192. Definitions.

(a)     Nude, or a State of Nudity means the showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft with less than a full opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

(b)     Specified Anatomical Areas means:

(1)     the human male genitals in a discernibly turgid state, even if completely and opaquely covered; or

(2)     less than completely and opaquely covered human genitals, pubic region, anal cleft, or a female breast below a point immediately above the top of the areola.

Sec. 58-193. Violations.

It shall be unlawful for any person to be on the beach, boardwalk, public parks, parking lots, streets, avenues, alleys or any other public place with the person's specified anatomical areas nude or in a state of nudity.

Sec. 58-194. Penalties.

Any person who is found to be in any violation of this Article shall be deemed to be guilty of a municipal infraction and be subject to a fine of up to $1,000.00.

INTRODUCED at a meeting of the City Council of Ocean City, Maryland held on June 10, 2017.

ADOPTED AND PASSED, as an Emergency Ordinance, by the required vote of the elected membership of the City Council and approved by the Mayor at its meeting held on June 10, 2017.

See Emergency Ordinance 2017-10, **Exhibit 5.**

24.     The Emergency Ordinance indicates that the first reading of the Ordinance took place on June 10, 2017. See id.

25.     The Emergency Ordinance indicates that the second reading of the Ordinance took

place on "Emergency Ordinance," indicating that there was no second reading of the Ordinance.

See id.

26.     The Emergency Ordinance is attested to by Diana L. Chavis, Clerk; Richard W.

Meehan, Mayor; Lloyd Martin, President; Mary P. Knight, Secretary; and Guy R. Ayres, III, City

Solicitor. See id.

27.     On June 10, 2017, Defendants, Meehan and Ocean City, issued the following Press

Release on Ocean City's website:

> Ocean City, Maryland – (June 10, 2017): While the Worcester County States'
> Attorney waits for an opinion from the Maryland Attorney General's Office, the
> Ocean City Council has passed local legislation after a woman expressed her desire
> to be bare-chested on Ocean City's beach. The woman, an advocate to "normalize
> bare-chestedness," believes it is her constitutional right under equal protection to
> be bare-chested in public.
>
> Ocean City officials disagree. The Council met on Saturday, June 10, to pass an
> emergency ordinance that prohibits offenses involving public nudity or those in a
> state of nudity. The ordinance states "there is no constitutional right for an
> individual to appear in public nude or in a state of nudity. Whatever personal right
> one has to be nude or in a state of nudity that right becomes subject to government
> interest and regulation when one seeks to exercise it in public."
>
> Further, the ordinance reads, "equal protection clause does not demand that things
> that are different in fact be treated the same in law, nor that a government pretend
> there are no physiological differences between men and women."
>
> The council voted unanimously in favor of the emergency ordinance.

See Website Press Release, **Exhibit 6.**

28.     Defendant Meehan further stated, "This ordinance provides clarity as to the position

of the Town of Ocean City, that we will not allow women to be topless on our beach or on any

public property within city limits."

29. A spokesperson for the Police Department stated, "We're very much looking forward to more clarity on the indecent-exposure law from the Maryland Attorney General's Office just so our officers have a more clear and concise direction on how to move forward with certain incidents."

30. On June 14, 2017, the Office of Attorney General issued a letter to Beau H. Oglesby, State's Attorney, Worcester County, Maryland. See Letter, **Exhibit 7.**

31. Notably, the Office of the Attorney General declined to issue an official opinion on the topic, and instead issued a "letter of advice" bearing the signature of a staff attorney instead of the Attorney General himself.

32. The letter purports to be in response to Oglesby's apparent request for an opinion "whether State or local indecent exposure laws may constitutionally be interpreted to allow men to appear bare-chested in public while simultaneously forbidding women to do the same." Id. at p. 1.

33. The letter provides the following opinion, "It is our view that Maryland courts would hold that prohibiting women from exposing their breasts in public while allowing men to do so under the same circumstances does not violate the federal or State Constitution." Id.

34. Notably, the letter also provides the following statement, which provides the Defendants with little clarity or guidance:

> While we conclude that the Court of Appeals would uphold the application of Maryland's indecency laws against female toplessness, we also know that "public morals are not static in this realm." *Biocic,* 928 F.2d at 116 n.4. And when public sensibilities begin to change, they can change quickly. We also recognize that what is seen as "indecent" can depend on context. Law enforcement officials may consider that context when exercising their enforcement discretion and thus are best positioned to ensure that Maryland's indecency laws are applied no more broadly than public sensibilities require. *See Id.* at 117 (Murnaghan, J. concurring).

35.     In accordance with the Beach Patrol's "policy" and "official procedure," now that the Beach Patrol has received "specific guidance from the State's Attorney, the City Solicitor and the Mayor and Council," that essentially deems the Emergency Ordinance to be lawful, it is reasonable to conclude that the Beach Patrol will begin to enforce the Emergency Ordinance.

## VI.     Correlation Between Morality and Perceived Risk

36.     Scientific research has found a correlation between people's moral judgments about a thing and the risk they perceive to exist in that thing.  Lombrozo, Tania, *"Why Do We Judge Parents for Putting Kids at Perceived – But Unreal – Risk?"* National Public Radio, August 22, 2016.

37.     It has been determined that the more a person feels that an act is morally wrong, the more danger the person perceives to exist as a result of that act; even when data clearly establishes that the perceived danger does not actually exist. Id.

38.     Gender, race, and class bias often results from this phenomenon, as well as the creation and enforcement of laws that defy logic.

> When people think they are judging danger to a child, much of what they are actually doing is imposing a moral judgment on the child's parents. The relevant "danger" should be legally defined in terms of actual, immediate, demonstrable risk, rather than left up to the unexamined intuitions of bystanders, social workers, police officers and other individuals who may think something must be dangerous when it is actually quite safe.  For example, eight times more children are killed in parking lots than in parked cars.  But when a parent with a child in tow runs into a grocery store for a few minutes, he or she has to choose between allowing the child to wait in the car, which is safer but might get her arrested or jailed and/or her child taken away – and the more dangerous option of bringing the child with her because this is socially approved.

Id.

## VII.     Anatomy and Physiology of the Human Breast

The breast is an organ which (sic) whose structure reflects its special function: the production of milk for lactation. The epithelial component of the tissue consists of lobules, where milk is made, which connect to ducts that lead out to the nipple. . . .

17

The structure of the male breast is nearly identical to that of the female breast, except that the male breast tissue lacks the specialized lobules, as there is no physiologic (sic) need for milk production by the male breast.

See http://pathology.jhu.edu/breast/anatomy.php.

## VIII.   Scientific Research Debunks the Sexist Ideology on Which the Emergency Ordinance is Based

39.     Scientific research reveals that laws like the Emergency Ordinance promote and expand sexist treatment of women, and cause specific identifiable physical and emotional harm to female children and adult women.

40.     "According to objectification theory (Fredrickson & Roberts, 1997), female bodies are scrutinized and evaluated to a greater degree than male bodies are, which leads to sexual objectification of women." Philippe Bernard, et al., "Integrating Sexual Objectification with Object Versus Person Recognition: The Sexualized-Body-Inversion Hypothesis," *Psychological Science*, 23 (2012).

41.     "Sexual objectification is related to decreased mind attribution (Loughnan et al., 2010), diminished agency perception (Cikara, Eberhardt, & Fiske, 2010), and dehumanization (Vaes, Paladino, & Puvia, 2011)." Philippe Bernard, et al., "Integrating Sexual Objectification with Object Versus Person Recognition: The Sexualized-Body-Inversion Hypothesis," *Psychological Science*, 23 (2012).

42.     A study examining the validity of claims that both traditional masculine ideology and dominant media content commonly construct men as sexual agents and women and their bodies as sexual objects (resulting in a mindset that women's bodies are mostly for men's sexual pleasure and less for reproduction and nursing), concluded, in part, that "endorsing these traditional beliefs about gender was associated with expressing more negative views toward childbirth, less support for public breastfeeding (both in general and for a potential partner), and

18

more concern that breastfeeding interferes with marital/sexual relations." Ward, L. Monique; Merriwether, Ann; & Caruthers, Allison, "Breasts Are for Men: Media, Masculinity Ideologies, and Men's Beliefs About Women's Bodies," *Sex Roles* (2006).

43.     A study examining infant feeding methods as a public policy issue and the related motivations for women to initiate or terminate breastfeeding, determined, in part, that one of the reasons that woman either never started or stopped breastfeeding was that "women were personally embarrassed to breastfeed in public or believed that breastfeeding was not socially sanctioned behavior. Not wanting to violate the unwritten taboo against nursing in public, these mothers were driven to find private places to nurse." Gengler, Charles E.; Mulvey, Michael S.; Oglethorpe, Janet E.; "A Means-End Analysis of Mothers' Infant Feeding Choices," *Journal of Public Policy & Marketing;* Fall 1999.

44.     A study examining sociocultural agents influencing body dissatisfaction and dietary restraint in adolescent girls, determined, in part, that "sociocultural influences added substantially to prediction over and above body size and dissatisfaction, supporting the important role of sociocultural influence in predicting dieting behaviors of adolescent girls." Dunkley, Tracy L.; Wertheim, Eleanor H.; Paxton, Susan J.; "Examination of a Model of Multiple Sociocultural Influences on Adolescent Girls' Body Dissatisfaction and Dietary Restraint," *Adolescence;* Summer 2001.

45.     A study investigating the associations between naturist activity and psychological well-being, "found that those who spent time naked or partially naked around others (eg. topless sunbathing or taking part in World Naked Cycle Rides), also liked their own bodies more, thought better of themselves, and were more satisfied with their lives overall." Sarah Cox, "The naked truth – research finds nudism makes us happier," *Goldsmiths University of London,* (Jan. 25, 2017).

46.    A study found a strong correlation between a low body image in girls and future poor health (a correlation they did not observe in boys) and that bullying and body-shaming contributed heavily to their low body image.  Olsen, Jeremy, "Body Image Affects Weight Gain in Teen Girls, University of Minnesota Study Finds," *www.startribune.com,* September 15, 2015.)

47.    *The United States Surgeon General's Call to Action to Support Breastfeeding*, *2011,* emphasized the many health benefits of breastfeeding but also identified a number of barriers to breastfeeding.  In the section titled, "Embarrassment," the report provided,

> A study that analyzed data from a national public opinion survey conducted in 2001 found that only 43 percent of U.S. adults believed that women should have the right to breastfeed in public places. Restaurant and shopping center managers have reported that they would either discourage breastfeeding anywhere in their facilities or would suggest that breastfeeding mothers move to an area that was more secluded. When they have breastfed in public places, many mothers have been asked to stop breastfeeding or to leave. Such situations make women feel embarrassed and fearful of being stigmatized by people around them when they breastfeed. Embarrassment remains a formidable barrier to breastfeeding in the United States and is closely related to disapproval of breastfeeding in public. Embarrassment about breastfeeding is not limited to public settings, however. Women may find themselves excluded from social interactions when they are breastfeeding because others are reluctant to be in the same room while they breastfeed. For many women, the feeling of embarrassment restricts their activities and is cited as a reason for choosing to feed supplementary formula or to give up breastfeeding altogether.

http://www.ncbi.nlm.nih.gov/books/NBK52688/ (internal citations removed).

## Count I

**Plaintiffs v. Defendants**
**Equal Protection – Fourteenth Amendment**
**Seeking Preliminary and Permanent Injunction**
**(Pursuant to 42 U.S.C. § 1983)**

48.    Paragraphs 1 through 47 are incorporated herein by reference.

49.    To win a preliminary injunction, a Plaintiff must demonstrate that (1) she is likely to succeed on the merits; (2) she will likely suffer irreparable harm absent an injunction; (3) the

balance of hardships weighs in her favor; and (4) the injunction is in the public interest. See Pashby v. Delia, 709 F.3d 307, 320-21 (4th Cir. 2013) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

### A.  Plaintiffs Will Likely Succeed on the Merits

50.    In J.E.B. v. Alabama ex rel. T. B., 511 U.S. 127, 136 (1994), the U.S. Supreme Court stated, "this Court consistently has subjected gender-based classifications to heightened scrutiny in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of "archaic and overbroad" generalizations about gender. See also Reed v. Reed, 404 U.S. 71 (1971); Schlesinger v. Ballard, 419 U.S. 498 (1975), Craig v. Boren, 429 U.S. 190 (1976); Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985). [2]

51.    This heightened standard bars governments from discriminating on the basis of gender differences when doing so is a means of "creat[ing] or perpetuat[ing] the legal, social, and economic inferiority of women." Virginia, 518 U.S. at 534.

---

[2] See also DeWeese v. Town of Palm Beach, 812 F.2d 1365 (11th Cir. 1987), the 11th Circuit struck down an ordinance of the Town of Palm Beach that prohibited its citizens (men and women) from appearing downtown without a garment covering the upper portion of their bodies, that was "designed (1) to stabilize its land values and maintain its role as a residential community; and (2) to maintain the history, tradition, identity and quality of life of the Town." The Court decided that there was no rational basis for the ordinance, and thus, violated a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Notably, the rational basis test that the ordinance failed to meet, is significantly lower than the heightened scrutiny standard that is applicable in this matter. The Court explained,

> The instant restrictions cannot be distinguished satisfactorily from a regulation requiring all citizens when appearing in public to wear a brown shirt, see Miller v. School District No. 167, 495 F.2d at 665 n. 25, or from a regulation prohibiting women from appearing in public in slacks or with bare calves or dresses above the knee, or from a regulation requiring all men appearing in public after sundown to wear a black tie and tails. We are satisfied that such intrusions on the liberty interests of citizens at large would not pass constitutional muster, absent identification of some rational basis which has not yet been brought to our attention and which is beyond our present imagination.

DeWeese, 812 F.2d at 1369.

52.     "[G]ender classifications that rest on impermissible stereotypes violate the Equal

Protection Clause, even when some statistical support can be conjured up for the generalization."

J.E.B., 511 U.S. at 139 n.11 (1994); Univ. for Women v. Hogan, 458 U.S. 718, 726 (1982).

53.     In 2017, in Free The Nipple - Fort Collins v. City of Fort Collins, Civil Action 16-

cv-01308-RBJ (D.Co.), the Colorado District Court granted a preliminary injunction enjoining the

City of Fort Collins from enforcing an ordinance prohibiting women from exposing their breasts

in public other than for purposes of breastfeeding.

54.     The Court explained that "our history is littered with many forms of discrimination,

including discrimination against women. As the barriers have come down, one by one, some

people were made uncomfortable. In our system, however, the Constitution prevails over popular

sentiment." Id.

55.     In explaining that the unlawful ordinance "perpetuates a stereotype engrained in

our society that female breasts are primarily objects of sexual desire whereas male breasts are not,"

the Court astutely noted,

> At bottom this ordinance is based upon *ipse dixit*-the female breast is a sex object
> because we say so. That is, the naked female breast is *seen* as disorderly or
> dangerous because society, from Renaissance paintings to Victoria's Secret
> commercials, has conflated female breasts with genitalia and stereotyped them as
> such. The irony is that by forcing women to cover up their bodies, society has made
> naked women's breasts something to see.

Id.

56.     The Court explained that it "do[es] not accept the notion . . . that we should continue

a stereotypical distinction 'rightly or wrongly,' or that something passes constitutional muster

because it has historically been a part of 'our culture.'" Id.

57.     The Emergency Ordinance in question purports to protect "the public sensibilities"

based on (1) "an indisputable difference between the sexes" and, (2) "females baring their breasts

in public . . . is still seen by society as unpalatable." <u>See</u> Emergency Ordinance 2017-10, **Exhibit 5.**

58.     Contrary to its stated intention, the Emergency Ordinance does not seek to achieve an important government interest (or respond to an actual emergency).

59.     Rather, the Emergency Ordinance is an unlawful attempt to codify longstanding sexist ideology, and to "legally" establish that women are first and foremost sexual objects who are inferior to men.

60.     Defendant Meehan is quoted in the news as having stated, "Ocean City is a family resort, and we intend to do whatever is within our ability to also protect the rights of those families that [sic] visit us each year."

61.     Defendant Meehan appears to be out of touch with the mainstream opinion. <u>See</u> Baltimore Sun, "The Boobies Are Coming!" June 13, 2017 ("In their continuing efforts to make Ocean City more "family friendly," officials there are going after what's arguably the most family friendly body part of all: breasts – specifically those of the female variety.")

62.     Defendants, Meehan and Ocean City's, motives are suspect, considering the fact that in 2014, Ocean City was recognized as one of the most dangerous places to live in Maryland, yet said Defendants did not hold any emergency meetings or enact any emergency ordinances to "protect" families.   <u>See   http://www.baltimoresun.com/travel/oc-blog/bal-ocean-city-ranked-as-one-of-the-least-safe-places-in-maryland-20140416-story.html</u> .

63.     Despite the Emergency Ordinance's claimed focus on the "differences between the sexes," the ordinance (a) fails to mention that the only significant physiological difference between a male and female breast is that a female breast has *internal* structures associated with milk

production and delivery, whereas a male breast does not, and (b) focuses solely on the exterior appearance of the female breast.

64.    Importantly, the Emergency Ordinance seeks to unlawfully restrict a women's freedom because men purportedly cannot control their sexual urges.

65.    That which is forbidden, however, often becomes more desirable.

66.    In fact, as discussed above, scientific research confirms that sexist ideology results largely from the sexual objectification of women.

67.    Furthermore, the sexual objectification of women undermines the health of both men and women.

68.    Moreover, the Emergency Ordinance fails to identify any government interest that requires the treatment of a pre-pubescent female to be different than that of a pre-pubescent male.

69.    Finally, to the extent that Defendant, Ocean City, is concerned about public safety or economic downturn, the Emergency Ordinance is not narrowly tailored to achieve such purposes. United States v. Alvarez, 132 S. Ct. 2537, 2549 (2012) (holding that, under strict scrutiny, the government has a "heavy burden" to show "a direct causal link between the restriction imposed and the injury to be prevented").

70.    The more tailored approach to protect public safety or to prevent economic downturn would be to enforce existing criminal laws that ban unlawful drugs, prostitution, disorderly conduct, and assault.

71.    As such, the Plaintiffs will likely succeed on the merits.

### B.  **Plaintiffs Will Likely Suffer An Irreparable Harm**

72.     Any infringement of one's constitutional rights inflicts an irreparable injury. <u>See</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (holding that the denial of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury").

73.     The Plaintiffs have frequented Ocean City, and intend to continue to do so in the immediate future.

74.     While in Ocean City, the Plaintiffs intend, at times, to be bare-chested in public in the same locations where it is lawful for men to be bare-chested for purposes other than breastfeeding.

75.     The Individual Defendants are policymakers for Defendant, Ocean City.

76.     As policymakers for Defendant, Ocean City, the Individual Defendants will determine whether or not Defendant, Ocean City, will have its Beach Patrol and/or Police Department enforce the unlawful Emergency Ordinance.

77.     While discussing or referencing the Emergency Ordinance, the Defendants have referenced Plaintiff, Chelsea Eline, personally, in public statements.

78.     Pursuant to the Emergency Ordinance, if not enjoined from doing so, the Defendants will cause the Plaintiffs to be cited and fined $1,000 each time they appear bare-chested.

79.     Furthermore, if the Plaintiffs continue to exercise their constitutional right, the Defendants, if not enjoined from doing so, will cause the Plaintiffs to be physically arrested and/or incarcerated.

80.     The only way to avoid the $1,000 fine, physical arrest, and/or incarceration is for the Plaintiffs to adhere to the governments' denial of their constitutional right.

### C.  <u>The Balance of Hardships Weighs in Plaintiffs' Favor</u>

81.     The denial of a constitutional right by the government is a significant injury. <u>See</u> <u>id.</u> at 373.

82.     Claimed rights based solely on morality are outweighed by the need to protect the constitutional rights of others. <u>See</u> <u>Fort Collins</u>, Civil Action 16-cv-01308-RBJ.

### D.  <u>An Injunction is in the Public Interest</u>

83.     "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." <u>Id.</u>

84.     Moreover, it is in the public's interest to protect children. <u>See</u> Free the Nipple – Fort Collins, 2017 U.S. Dist. LEXIS 24648, at *8 ("Children do not need to be protected from the naked female breast itself but from the negative societal norms, expectations, and stereotypes associated with it.")

85.     As a direct and proximate result of the Defendants' conduct, Plaintiffs will suffer embarrassment, humiliation, physical and psychological harm, pain and suffering, loss of liberty, and/or financial harm; some or all of which may be permanent.

86.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have incurred attorneys' fees and other costs.

### <u>Count II</u>

**Plaintiffs v. Defendant, Town of Ocean City, Maryland**
**Equal Protection – Fourteenth Amendment – Municipal Liability**
**(Pursuant to 42 U.S.C. § 1983)**

87.     Paragraphs 1 through 47 are incorporated herein by reference.

88.     "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

89.     In addition, a failure to train may give rise to municipal liability, if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989).

90.     The Plaintiffs' injuries will be caused by an official policy and lack of training by Defendant, Town of Ocean City, Maryland.

91.     As a direct and proximate result of the Defendant's conduct, Plaintiffs will suffer embarrassment, humiliation, physical and psychological harm, pain and suffering, loss of liberty, and/or financial harm; some or all of which may be permanent.

92.     As a direct and proximate result of the Defendant's conduct, Plaintiffs have incurred attorneys' fees and other costs.

## Count III

**Plaintiffs v. Defendants**
**Equality of Rights – Declaration of Rights, Art. 46**
**Seeking Preliminary and Permanent Injunction**
**(Pursuant to Maryland State Law)**

93.     Paragraphs 1 through 47 are incorporated herein by reference.

94.     Article 46 of the Declaration of Rights to the Maryland Constitution provides, "Equality of rights under the law shall not be abridged or denied because of sex."

95.     In determining whether to grant or deny a preliminary injunction, the trial court must assess the following four factors:

(1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the

plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest. <u>Ehrlich v. Perez</u>, 394 Md. 691, 708 (MD 2006) (<u>quoting</u> <u>Department of Transportation v. Armacost</u>, 299 Md. 392, 404-05 (1984)).

96.    Paragraphs 49 through 84 are stated herein by reference.

97.    As a direct and proximate result of the Defendants' conduct, Plaintiffs will suffer embarrassment, humiliation, physical and psychological harm, pain and suffering, loss of liberty, and/or financial harm; some or all of which may be permanent.

98.    As a direct and proximate result of the Defendants' conduct, Plaintiffs have incurred attorneys' fees and other costs.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.    **Declaratory Judgment:** An Order declaring that Emergency Ordinance 2017-10, An Ordinance To Amend Chapter 58, Entitled Offenses And Miscellaneous Provisions, of The Code of The Town of Ocean City, Maryland, **Exhibit 5,** violates the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution, and Article 46 of the Declaration of Rights to the Maryland Constitution.

B.    **Preliminary Injunction:** An Order, enjoining the Defendants from enforcing Emergency Ordinance 2017-10, An Ordinance To Amend Chapter 58, Entitled Offenses And Miscellaneous Provisions, of The Code of The Town of Ocean City, Maryland, **Exhibit 5,** during the pendency of this litigation.

C.    **Permanent Injunction:** An Order, forever enjoining the Defendants from enforcing Emergency Ordinance 2017-10, An Ordinance To Amend Chapter 58, Entitled Offenses And Miscellaneous Provisions, of The Code of The Town of Ocean City, Maryland, **Exhibit 5**.

D.    **Attorney's Fees and Costs**; and

E.      **Discretionary Damages and Relief:** Such other financial or equitable relief that

the Court deems reasonable and just.

**Respectfully Submitted,**

_____          Date: January 16, 2018
**JASON G. DOWNS, ESQUIRE**
MD Bar Number: 29575
**DOWNS COLLINS PA**
20 S. Charles Street, Suite 901, Baltimore, MD 21201
410.462.4529 | Jason@downscollins.com
(Local Counsel for Plaintiffs)


_____/s/ Devon M. Jacob, Esquire_____          Date: January 16, 2018
**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D.: PA 89182
Counsel for Plaintiffs
**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Lead Counsel for Plaintiffs) (*Pro Hac Vice Pending*)