IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| CHELSEA C. ELINE, ET AL. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-cv-00145-JKB |
| | ) | |
| TOWN OF OCEAN CITY, MARYLAND | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | _____ |

### DEFENDANT TOWN OF OCEAN CITY, MARYLAND'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, TOWN OF OCEAN CITY, MARYLAND ("Defendant" or "City"), by and through its attorneys, Bruce F. Bright and Ayres, Jenkins, Gordy & Almand, P.A., and hereby moves for summary judgment as to the claims of Plaintiffs CHELSEA C. ELINE, MEGAN A. BRYANT, ROSE R. MACGREGOR, CHRISTINE E. COLEMAN, and ANGELA A. URBAN (collectively, "Plaintiffs"), and in support thereof states as follows:

### INTRODUCTION/BACKGROUND

This case challenges the constitutionality of an Ocean City, Maryland Ordinance (specifically, Ordinance 2017-10), amending Chapter 58 of the Ocean City Code ("the Ordinance" or "the subject ordinance"). The Ordinance, under newly-added "Article V" of Chapter 58 of the City Code, makes it unlawful for a person to "be on the beach, boardwalk, public parks, parking lots, streets, alleys, [and] other public place[s] with the person's specified

anatomical areas nude or in a state of nudity."  The "female breast below a point immediately above the top of the areola" is included within the Ordinance as a "specified anatomical area."[1]

---

[1] The pertinent section of the Ocean City Code is as follows:

**ARTICLE V. - OFFENSES INVOLVING PUBLIC NUDITY OR STATE OF NUDITY**

**Division 1. - Generally.**

**Sec. 58-191. - Legislative findings.**

(a) There is no constitutional right for an individual to appear in public nude or in a state of nudity. It does not implicate either the First Amendment to the United States Constitution, the right to privacy, or a protected liberty interest. It lacks any communicated value that might call for First Amendment protection. Nor does it implicate the right of privacy or the right to be alone: one does not have right to impose one's lifestyle on others who have an equal right to be left alone.

(b) Whatever personal right one has to be nude or in a state of nudity, that right becomes subject to government interest and regulation when one seeks to exercise it in public.

(c) A gender-based distinction challenged under the equal protection clause of the United States Constitution is gauged by an important governmental interest that is substantially accomplished by the challenged discriminatory means.

(d) Protecting the public sensibilities is an important governmental interest based on an indisputable difference between the sexes. Further, a prohibition against females baring their breasts in public, although not offensive to everyone, is still seen by society as unpalatable.

(e) The equal protection clause does not demand that things that are different in fact be treated the same in law, nor that a government pretend there are no physiological differences between men and women.

**Sec. 58-192. - Definitions.**

*Nude,* or a *State of nudity* means the showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft with less than a full opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

*Specified anatomical areas* means: (1) The human male genitals in a discernibly turgid state, even if completely and opaquely covered; or (2) Less than completely and opaquely covered human genitals, pubic region, anal cleft, or a female breast below a point immediately above the top of the areola.

Accordingly, the Ordinance (among other things) makes it unlawful for women to be "topless" or "bare-chested" (more specifically, with their breasts fully exposed) in certain enumerated public places in Ocean City. Plaintiffs challenge this aspect of the Ordinance, asserting that it violates the Equal Protection Clause of the 14th Amendment of the U.S. Constitution (Counts I and II) and Article 46 of the Maryland Declaration of Rights (Count III). Their lawsuit, in its entirety, is a "facial" challenge to the constitutionality (both federal and state) of the Ordinance, and more particularly, the section of the Ordinance prohibiting the female breast from being fully exposed in specified public places in Ocean City.

All three Counts in the Complaint are advanced against the Town of Ocean City; Counts I and III were previously advanced against the Town of Ocean City and three of its officials – Richard W. Meehan (the Mayor), Joseph J. Theobald (Director of Emergency Services), and Ross C. Buzzuro (Chief of the Ocean City Police Department). When the City filed its Answer to the Complaint, the individual Defendants (Meehan, Theobald, and Buzzuro) filed a Rule 12(b)(6) Motion to Dismiss. ECF Doc. No. 14. After discussions between counsel, Plaintiffs stipulated (on certain agreed terms) to a dismissal of the individual Defendants (Meehan, Theobald, and Buzzuro). ECF Doc. No. 16.

---

**Sec. 58-193. - Violations.**

It shall be unlawful for any person to be on the beach, boardwalk, public parks, parking lots, streets, avenues, alleys or any other public place with the person's specified anatomical areas nude or in a state of nudity.

**Sec. 58-194. - Penalties.**

Any person who is found to be in any violation of this article shall be deemed to be guilty of a municipal infraction and be subject to a fine of up to $1,000.00.

On June 29, 2018, Plaintiffs filed a Motion for Preliminary Injunction, asking this Honorable Court to enjoin the City from enforcing the Ordinance while the case is pending. ECF Doc. No. 21-22.  Defendant Ocean City filed a response and opposition to the Plaintiffs' Motion for Preliminary Injunction. ECF Doc Nos. 27, 27-1.

By "Memorandum and Order" dated August 22, 2018 (and entered August 23, 2018) (ECF Doc No. 32), this Court directed that an evidentiary hearing would be held on the preliminary injunction motion; and made certain "observations" that defined not only the scope of the evidentiary hearing, but also the scope of the case more generally:

1) In *United States v. Biocic*, 928 F.2d 112 (4th Cir. 1991), the Fourth Circuit Court of Appeals considered and upheld the constitutionality of a County ordinance that prohibited public exposure of the female breast, and held in essence that, so long as an ordinance of that type protects and reflects the "moral sensibilities" of the population to which it applies, which is an important governmental objective/interest, it is constitutional.

2) The subject Ordinance was enacted by the duly elected Ocean City Council, which (at least arguably) is authorized "to speak, through legislation, in a manner that reflects the public sensibilities."

3) The weight of decisional law throughout the United States is consistent with *Biocic* and, in any event, Court will "respect the precedent set in *Biocic*."

The evidentiary hearing on the preliminary injunction motion was held on December 7, 2018. As directed by the Court, Ocean City presented its case first, including documentary evidence and testimony of Mayor Rick Meehan, Councilperson Mary Knight, Ocean City

Chamber of Commerce President and CEO Melanie Pursel, and Ocean City Clerk Diana Chavis. The Plaintiffs presented only the testimony of their purported expert, Dr. Debby Herbenick.

On December 20, 2018, this Court issued its Memorandum and Order (ECF Doc. No. 46), denying the Plaintiffs' motion for preliminary injunction. More particularly, this Court held that: 1) there is "no material difference" between the Ocean City ordinance at issue and the ordinance that was challenged and upheld by the Fourth Circuit in *Biocic*; 2) many other cases in other jurisdictions have been in accord with *Biocic*; 3) the *Fort Collins* case (discussed further below; arising in Colorado), since affirmed by the Tenth Circuit Court of Appeals, "does not bind this Court" especially in light of the binding precedent established by *Biocic*; 4) "the same public sensibilities noted in *Biocic* underlie the Ocean City ordinance"; 5) Ocean City's witnesses "by virtue of their roles and positions, are equipped to 'take the pulse' of the community and its visitors," are "accredited as accurate barometers of public sensibilities in Ocean City" concerning public exposure of female breasts, and are well-informed and "in touch" with the community they represent; and 6) **"[b]y adopting the subject ordinance unanimously, the elected representatives have expressed the referenced views and aspirations of the community[,]" and Ocean City "has shown its ordinance is substantially related to an important governmental objective, the protection of public sensibilities."**

Subsequent to this Court's ruling on the preliminary injunction motion, the parties conducted and completed written (paper) discovery and depositions. Discovery has not generated any factual dispute and, in general, what was presented at the preliminary injunction hearing has been further developed and continues to be the state of the evidence in this case. <u>Both sides believe the case is now in a posture to be decided on cross-motions for summary judgment.</u>

## UNDISPUTED FACTS

This matter originated from inquiries from Plaintiff Chelsea (Covington) Eline, submitted to the Ocean City Police Department and the Worcester County State's Attorney, regarding her intention to go "topless" in Ocean City including on its beaches. *See* Exhibit A, Unsworn Declaration of Mayor Richard W. Meehan. Eline's inquiries in this regard were submitted in writing on or about August 17, 2016 and led then-Worcester County State's Attorney (now Worcester County Circuit Court Judge) Beau Oglesby to seek advice/guidance on the issue from the Maryland Attorney General's Office. *See* **Exhibit A**. Eline took the position in her communications and interactions with Oglesby's office and the Ocean City Police Department that she had a constitutionally-protected right to be topless (i.e., expose her breast) in public, including in Ocean City and on its beaches. *See* **Exhibit A**.

While Judge (then-State's Attorney) Oglesby awaited the AG's opinion/guidance – specifically, as to whether State or local indecent exposure laws can constitutionally be interpreted to allow men to bare-chested in public while prohibiting women from doing so – the possibility of women being topless on Ocean City beaches became a matter of great public attention and concern. *See* Exhibit A. The Mayor and members of the Ocean City Council received many emails and phone calls from Ocean City residents and vacationers expressing great concern about the possibility that Ocean City beaches would "become topless beaches." *See* Exhibit A.[2] This uproar led to one or more statements by the Town of Ocean City reassuring

---

[2]     Information technology personnel at the Town of Ocean City have performed a search for emails sent to the Mayor on the subject of "toplessness" in Ocean City and on its beaches. That search revealed more than 100 such emails, beginning in late 2016 when the issue surfaced in media reports and on social media, from Ocean City residents and visitors (including many "legacy" Ocean City vacationers), expressing great concern and dismay about the prospect of female nudity (toplessness) at the beach, and the negative impact this would have on the moral sensibilities of  visitors and residents and on the family-oriented character and quality of Ocean

the public that the City is not, and would not become, a topless beach. *See* **Exhibit A**, attachment 1. In addition, before the AG's Office had taken a position on the matter, to preserve and protect the family-oriented character and quality of Ocean City and its beaches, the Council properly (and publicly) considered and adopted the subject Ordinance (as an emergency ordinance, on June 10, 2017). *See* **Exhibit A**, attachment 2. Attached as **Exhibit E** is a copy of the transcript of the special meeting of the Mayor and Council during which the Ordinance was adopted.

Several days later, on June 14, 2017, the Maryland Attorney General's Office issued its "Advice of Counsel" letter (authored by Sandra Benson Brantley, Counsel to the General Assembly, and Adam D. Snyder, Chief Counsel, Opinions & Advice), in which the AG's Office opined (or advised) that:

> Ultimately, our job here is to predict how the Maryland Court of Appeals would resolve this issue if presented to it . . . [T]he principle that lies at the heart of this issue [is] that the Equal Protection Clause and state equal rights amendments generally do not prohibit disparate treatment of men and women on the basis of physical characteristics unique to one sex . . . [T]he clear majority of cases from other jurisdictions – including the Fourth Circuit – have applied that principle to uphold the constitutionality of ordinances prohibiting women, but not men, from appearing topless in public . . . We see little reason to believe that the Court of Appeals would join the handful of courts in reaching the opposite conclusion.

*See* **Exhibit A**, attachment 3.

According to the City's Tourism Strategic Plan prepared in December 2014, well before any of the underlying events and controversy, its "vision" for the future of tourism is based on several historically-based principles including most importantly Ocean City being a "family-

---

City and its beaches. *See* **Exhibit B**, Unsworn Declaration of Christopher W. Holloway; **Exhibit C**, Unsworn Declaration of Diana Chavis. Many who emailed expressed an intention to stop coming to Ocean City, and to stop bringing family, if nudity (toplessness) was permitted to occur. *See* **Exhibit B**, Unsworn Declaration of Christopher W. Holloway; **Exhibit C**, Unsworn Declaration of Diana Chavis. *See* **Exhibit D – printed copies of such emails with names and email addresses of senders redacted**.

friendly resort community" (meaning, family activities, families feeling safe and secure, the City

being "a great destination for families" and a "family tradition," with "all definitions of "family"

feeling welcome). *See* **Exhibit A**, attachment 4.  Ocean City has long been identified by its

visitors, and has identified itself, as a family-friendly resort catering to visitors of all ages.  A

recent draft of the City's Comprehensive Plan describes Ocean City as "[a] destination resort, . . .

nationally recognized as a clean and safe community for its residents, vacation homeowners and

visitors with tourism as the basis of its economy." *See* **Exhibit A**, attachment 5 (at p.

Introduction-2). The median age of Ocean City's population is (and has been) trending up, with

the median age now at 54.2. *See* **Exhibit A**, attachment 5 (at p. 1-13).

The Ordinance was adopted to advance Ocean City's legitimate interests in promoting

decency, protecting morals and prevailing moral sensibilities, and protecting the order, health,

safety, and well-being of the populace, by prohibiting public nudity. Advancing these interests

constitutes an important governmental objective for the Town of Ocean City, as it does for any

city/municipality, but in particular in light of Ocean City's long-standing and highly valued

identity as a family-oriented vacation, recreation, and travel destination. This identity and

character of Ocean City is the bedrock of its tourism-based economy and must be preserved and

protected by the Ocean City government for the benefit of taxpayers, residents and visitors. The

subject Ordinance, in the view of the Mayor and City Council, advances such important

governmental objectives and it is directly related to, and formulated and intended to accomplish,

those objectives. *See* **Exhibit A**.

*Other Pertinent Evidence developed in the case*:

**Mayor Meehan testified at the December 2018 hearing[3] that**:

1)      Pursuant to Section 413 of the Ocean City Charter (**Exhibit F**), he is the chief representative and spokesperson of Ocean City before all state, federal, and local governmental bodies. (December 7, 2018 Hearing Tr., at p. 15)

2)      Mayor Meehan has lived in Ocean City since 1971, has been a real estate agent there since 1993, was first elected to the Ocean City Council in 1985, and became the Mayor in 2006, having been most recently re-elected in 2018 (*after the subject ordinance was adopted*). (December 7, 2018 Hearing Tr., at pp. 14-15)

3)      In his capacity as Mayor, he regularly receives and responds to telephone, email, and other inquiries and comments from Ocean City residents and visitors; he attends all meetings of the Mayor and Council; he serves on a variety of Ocean City governmental boards and commissions; he works with the Council at work sessions and public meetings to formulate policies and ordinances; he attends a variety of public and/or private events in and around Ocean City, interacting regularly with residents and visitors; he attends and participates in meetings of member associations having commercial involvement in Ocean City; he maintains an email address that is available to the public; he invites and hears public comments at all Council and other City meetings that are open to the public. (December 7, 2018 Hearing Tr., at pp. 17-19)

4)      In 2017, he began receiving concerned inquiries and comments on the subject of public nudity in Ocean City, in person, by phone, and by email. The e-mails represented generations of people that have visited Ocean City; they were passionate and "very upset";

---

[3]      Defendant incorporates by reference the transcript of the December 7, 2018 evidentiary hearing, which has been generated and filed and is part of the record in this case. ECF Doc No. 51.

"[m]any of them said they would not return to Ocean City if, in fact, toplessness was allow[ed]." The Mayor responded to those emails by providing re-assurance that the Mayor and Council would take "whatever appropriate action . . . [to] defend the moral sensibilities, sensitivities of those who visited Ocean City." The email response and reaction on the matter from residents and visitors was "the largest, by far, . . . of any emails I've gotten directly to my office on any subject, on any issue." He also received phone calls on the subject, which were consistent with the emails. Council members received similar communications. (December 7, 2018 Hearing Tr., at pp. 29-32)

5)      His understanding of the moral sensibilities of Ocean City residents and visitors as to female toplessness was gleaned from the emails he received, the conversations he had with people, comments of mothers, fathers, and grandparents; and he "did not run into anybody or talk to anybody that opposed the direction we were taking" on the matter (i.e., he heard from no one who supported public female toplessness). (December 7, 2018 Hearing Tr., at p. 38)

6)      The Mayor was re-elected having openly and expressly supported the subject Ordinance and having openly and expressly opposed public female toplessness; the stance that the Mayor and Council had taken through the Ordinance, was discussed by him openly and explicitly during the election campaign.  (December 7, 2018 Hearing Tr., at pp. 39, 41-42)[4]

---

[4]      *See also* Defendant's sworn Interrogatory Answers, at p. 5, response to Interrogatory No. 9 (**Exhibit G**): "**Mayor Rick Meehan and Council members Lloyd Martin and Matthew James were all re-elected in 2018, after the subject Ordinance was adopted and reported on extensively in the local news media**. No other member of the Council serving at the time the subject Ordinance was adopted has faced re-election (i.e., has reached the end of his/her respective terms)."

**Council member Mary Knight testified during the December 7 hearing as follows**:

1)       She has been an Ocean City Council member for twelve years, and during eight of those years, she has been the Chair of the Tourism Commission. (December 7, 2018 Hearing Tr., at p. 71)

2)       She received communications from constituents and others in the Spring of 2017, regarding the issue of public female toplessness, and it became a matter of "major concern." She received phone calls and emails on the matter, and many people raised it with her in person, at local restaurants, the grocery store, the dry cleaner, Wal-Mart, etc.  (December 7, 2018 Hearing Tr., at p. 74-75)

3)       The Ordinance accurately reflects the sensibilities of Ocean City residents and visitors as to public female toplessness – based on "the conversations that I had with many people in town, out of town, the emails we received, just the overall concern."  Other council members received similar communications expressing similar concerns. <u>She did not receive any phone calls or face-to-face communications that reflected any support for public female toplessness.</u> (December 7, 2018 Hearing Tr., at p. 77)

**Ocean City Chamber of Commerce President and CEO Melanie Pursel testified during the December 2018 hearing that**:

1)       The Ocean City Chamber of Commerce operates a visitor's center and, in that regard, has regular contact with the public including Ocean City visitors and tourists; and its members are Ocean City merchants and businesses. (December 7, 2018 Hearing Tr., at pp. 89-90)

2)       In the Spring of 2017, prior to the adoption of the Ordinance, the Chamber's visitor's center received a number of inquiries and complaints (in-person, by phone, by email),

constituting a "nothing short of public outcry," in opposition to public female toplessness. These communications (or the substance of them) were passed onto to Ocean City officials at the time. (December 7, 2018 Hearing Tr., at p. 90-91)

## **ARGUMENT**

## I. **APPLICABLE LAW**

### A. **RULE 56 STANDARD OF REVIEW – SUMMARY JUDGMENT**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). *See also* Fed. R. Civ. P. 56(c).

The Supreme Court has reiterated its holding in the *Celotex* case, stating: "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted *so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied*." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990) (*quoting Celotex*, 477 U.S. at 323) (emphasis supplied); *see Edwards v. Aguillard*, 482 U.S. 578, 595 n. 16 (1987) ("There is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" (*quoting Celotex*, 477 U.S. at 323)). *See also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp*., 828 F.2d 211, 216 (4th Cir. 1987).

### B. **LAW APPLICABLE TO PLAINTIFFS' CLAIMS.**

The Plaintiffs' position in this case, as advanced in their Complaint and in their Motion for Preliminary Injunction, cuts sharply against a long line of cases from the great majority of

federal jurisdictions, including the Fourth Circuit, cuts against the "Advice of Counsel" issued by the Maryland Attorney General, and seeks to side-step settled Supreme Court jurisprudence in this particular area.

The Supreme Court has long held that a legislative body may not "make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class." *Parham v. Hughes*, 441 U.S. 347, 354 (1979). However, "because the Equal Protection Clause does not 'demand that a statute necessarily apply equally to all persons' or require 'things which are different in fact . . . to be treated in law as though they were the same,'" the Supreme Court "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. 464, 469 (1981) (*quoting Rinaldi v. Yeager*, 384 U.S. 305, 309 (1966)) (*and citing Parham v. Hughes, supra; Califano v. Webster*, 430 U.S. 313 (1977); *Schlesinger v. Ballard*, 419 U.S. 498 (1975); *Kahn v. Shevin*, 416 U.S. 351 (1974)).

"As the [Supreme] Court has stated, a legislature may 'provide for the special problems of women.'" *Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. at 469 (*quoting Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975)). In order to withstand constitutional challenge, a gender classification must: 1) serve important governmental objectives and 2) be substantially related to achievement of those objectives. *Craig v. Boren,* 429 U.S. 190, 197 (1976) (citations omitted). "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed v. Reed,* 404 U.S. 71, 76 (1971); *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920).

Consistent with those settled principles, in *United States v. Biocic*, 928 F.2d 112 (4th Cir. 1991), the Fourth Circuit Court of Appeals considered the constitutionality of a County ordinance that prohibited public exposure of the female breast (as well as the "male or female genitals, pubic area or buttocks").

As to the asserted equal protection claim, the Fourth Circuit held:

We assume, without deciding, as did the district court, that a distinction based upon anatomical differences between male and female is gender-based for equal protection analysis purposes. But we then agree with the district court that the distinction here is one that is substantially related to an important governmental interest, hence does not deny equal protection. The important government interest is the widely recognized one of protecting the moral sensibilities of that substantial segment of society that still does not want to be exposed willy-nilly to public displays of various portions of their fellow citizens' anatomies that traditionally in this society have been regarded as erogenous zones. These still include (whether justifiably or not in the eyes of all) the female, but not the male, breast. That does it, for the limited purpose of our legal inquiry. As Justice Stewart put it:

[W]e have recognized that in certain narrow circumstances men and women are not similarly situated; in these circumstances a gender classification based on clear differences between the sexes is not invidious, and a legislative classification realistically based upon those differences is not unconstitutional.

*United States v. Biocic*, 928 F.2d at 115–16 (*quoting Michael M. v. Sonoma County Superior Court,* 450 U.S. 464, 478 (1981)).

More recently, in rejecting an equal protection challenge to a zoning ordinance regulating the location and operation of adult entertainment businesses, the Fourth Circuit made reference to what the U.S. District Court for the District of Maryland had called "Fourth Circuit jurisprudence" holding "that ordinances designed to combat the undesirable secondary effects of adult businesses advance a substantial government interest." *Maages Auditorium v. Prince George's Cty., Maryland*, 681 F. App'x 256, 261 (4th Cir. 2017). *See also Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006) ("*Carandola II*") ("[E]ven without considering

any evidence, we can conclude that the State has a substantial interest in regulating nude and

topless dancing, because such entertainment has a long history of spawning deleterious effects."

(internal quotation marks omitted)).

On at least two occasions, the Fifth Circuit Court of Appeals has upheld adult

entertainment ordinances that regulate exposure of female breasts, but not male breasts,

challenged under the Equal Protection Clause. *SDJ, Inc. v. City of Houston,* 837 F.2d 1268 (5th

Cir.1988); *Hang On, Inc. v. City of Arlington,* 65 F.3d 1248 (5th Cir.1995). In both cases, the

Fifth Circuit held that regulation of female breasts, but not male breasts, was substantially related

to  legitimate governmental interest.

In *Ways v. City of Lincoln*, 331 F.3d 596 (8th Cir. 2003), the Eight Circuit held that a

municipality's "interests in preventing the secondary adverse effects of public nudity and

protecting the order, morality, health, safety, and well-being of the populace are important," and

found the public decency/anti-exposure ordinance in that case to be "substantially related to

those objectives," and thus constitutional under the applicable standard of review. *Ways v. City*

*of Lincoln*, 331 F.3d at 600.

In *Craft v. Hodel,* 683 F. Supp. 289 (D. Mass. 1988), the petitioners challenged a

regulation banning nude bathing in Cape Cod National Park. They alleged that the regulation

violated the equal protection component of the Fifth Amendment because males were permitted

to recreate "shirt free" but females were not permitted to do so. *Craft,* 683 F. Supp. at 299. The

Court held that the male-female distinction "simply recognizes a physical difference between the

sexes which has implications for the moral and aesthetic sensitivities of a substantial majority of

the country." *Id.* at 300.

In *Tolbert v. City of Memphis, Tenn.,* 568 F. Supp. 1285 (W.D. Tenn. 1983), the Court held that restricting the exposure of female breasts did not violate the Equal Protection Clause. The court reasoned that "[i]n our culture, for the purpose of this type of ordinance, female breasts are a justifiable basis for a gender-based classification." *Tolbert,* 568 F. Supp. at 1290.

In *Buzzetti v. City of New York*, 140 F.3d 134 (2nd Cir. 1998), the Second Circuit Court of Appeals held that an ordinance regulating adult establishments did not violate the equal protection clause, even though it distinguished between exposure of the male and female breast. *Id*. at 141-142. The Court noted in that case that "It is clear that '[g]ender has never been rejected as an impermissible [legislative] classification in all instances.'" *Id*. at 141 (*quoting Rostker v. Goldberg*, 453 U.S. 57, 69 n.7 (1981); *Kahn v. Shevin*, 416 U.S. 351, 356 n. 10 (1974)).  The Court held further that:

> The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*Buzzetti v. City of New York*, 140 F.3d at 141 (*citing and quoting United States v. Virginia,* 518 U.S. 515 (1996) (alteration in original) (citations omitted)). *See also J&B Social Club #1, Inc. v. City of Mobile*, 966 F. Supp. 1131 (S.D. Ala. 1996) (City ordinance prohibiting topless dancing in bars did not violate equal protection clause, even though definition of nudity in ordinance included female, but not male, breasts); *City of Jackson v. Lakeland Lounge of Jackson, Inc.*, 688 So.2d 742, 750-52 (Miss. 1996); *State v. Vogt*, 775 A.2d 551, 557-59 (N.J. Super. Ct. App. Div. 2001); *City of Tucson v. Wolfe*, 917 P.2d 706, 707-09 (Ariz. Ct. App. 1995); *State v. Turner*, 382 N.W.2d 252, 255-56 (Minn. Ct. App. 1986).

In *State v. Lilley*, 171 N.H. 766 (2019), the New Hampshire Supreme Court considered a constitutional challenge (on both free speech and equal protection grounds) to a local ordinance that banned public nudity, and under which the female defendants/appellants were charged for publicly exposing their breasts. Upholding the constitutionality of the ordinance, the Court in that case held in pertinent part as follows:

> [W]e have little trouble concluding that the defendants have not carried the heavy burden of mounting a successful facial attack to an ordinance analyzed only for rationality. The stated purpose of the ordinance is to uphold and support "public health, public safety, morals and public order.' LACONIA, N.H., CODE OF ORDINANCES ch. 180, art. I, § 180-1 (1998). Under the terms of the ordinance, "[t]he conduct prohibited … is deemed to be contrary to the societal interest in order and morality." *Id.* Federal courts have found these to be important or substantial interests under intermediate scrutiny, let alone legitimate ones under rational basis review. *See Tagami*, 875 F.3d at 379-80 (finding the purposes of "promoting traditional moral norms and public order" to be "important enough to  survive [intermediate] scrutiny"); *Biocic*, 928 F.2d at 115-16 (finding "important" the "government interest … [in] protecting the moral sensibilities of that substantial segment of society that still does not want to be exposed" to parts of the body "that traditionally in this society have been regarded as erogenous zones"); *Craft*, 683 F. Supp. at 299-300 (finding a sufficient state interest in "protect[ing] the public from invasions of its sensibilities"); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991). We likewise conclude that they are legitimate government interests. "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals." *Barnes*, 501 U.S. at 569. Furthermore, the ordinance is rationally related to advancing those interests. *See id.* at 571-72; *Craft*, 683 F. Supp. at 300-01. **For these reasons, we hold that the ordinance does not violate Part I, Article 2 of the New Hampshire Constitution**.
>
> **We reach the same result under the Federal Constitution as we do under the State Constitution. Federal courts applying federal equal protection analysis have near-uniformly upheld ordinances similar to Laconia's even when subjecting them to intermediate scrutiny**.
>
> \*     \*     \*
>
> That the ordinance may or may not "reflect sociological insight, or shifting social standards" is not determinative for our purposes. *Buchanan*, 584 P.2d at 921 (quotation omitted). "Our obligation" is to interpret and apply the law, "not to mandate our own moral code." *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 850, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). "We are told that

concepts of morality and propriety are changing"; if so, then "it can reasonably be expected that public demand will soon make it imperative that this portion of the ordinance be repealed." *Buchanan*, 584 P.2d at 920-21. The people of Laconia may make such a decision, but this court will not make it for them.

*State v. Lilley*, 171 N.H. at 776-777 (including fn. 3), 779.

### *The "Free the Nipple" Cases*

As purported legal authority for their position (including their request for a preliminary injunction), and in the face of the binding precedent of *Biocic* and all of the other decisional law on this subject, the Plaintiffs have relied in this case on two cases from other jurisdictions – *Free the Nipple—Fort Collins v. City of Fort Collins*, 237 F.Supp.3d 1126 (D. Colo. 2017) ("the *Fort Collins* case"), and *Free the Nipple—Springfield Residents Promoting Equality v. City of Springfield*, 153 F.Supp.3d 1037 (W.D. Mo. 2015) ("the *Springfield* case").

In the *Fort Collins* case, the trial court granted a preliminary injunction, recognizing in doing so that it was deviating from and directly contradicting long-established legal authority for the type of ordinance at issue. *Free the Nipple—Fort Collins v. City of Fort Collins*, 237 F.Supp.3d at 1131-1133. The Court conceded in that case that, in granting the plaintiffs' request for a preliminary injunction, it was "going out on a lonely limb" because in the Court's view it was "the right thing to do." *Free the Nipple—Fort Collins v. City of Fort Collins*, 237 F.Supp.3d at 1133.

Earlier this year, the trial court's decision was affirmed by the Tenth Circuit Court of Appeals, in *Free the Nipple—Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019). Although the Tenth Circuit found (preliminarily, in connection with a request for an injunction) that the subject ordinance violated the Equal Protection Clause under intermediate scrutiny, it did so with reference to the specific reasons the municipality had advanced in that instance to justify the ordinance:

To determine whether the City's public-nudity ordinance survives intermediate scrutiny, we first identify the City's proffered reasons for enacting a gender-based classification. Then, we ask whether the City's reasons qualify as important governmental objectives and, if so, whether the gender-based means employed substantially serve those objectives. *See Morales-Santana*, 137 S. Ct. at 1690 (citing *Virginia*, 518 U.S. at 533).

The City argues that the inherently sexual nature of the female breast, as opposed to the male breast, raises "myriad concerns" with "permitting adult females to go topless in public without restriction." Appellant's Opening Br. at 18. The City refers us to the preliminary-injunction hearing, where three city officials—the deputy city manager, the assistant chief of police, and the city aquatics supervisor—described some of these concerns. ***The officials testified that female toplessness could disrupt public order, lead to distracted driving, and endanger children. Citing these concerns, the City claims that prohibiting only female toplessness serves to protect children from public nudity, to maintain public order, and to promote traffic safety***.

*Free the Nipple—Fort Collins v. City of Fort Collins*, 916 F.3d at 802. The Tenth Circuit

analyzed and rejected each of those proffered rationales for the ordinance (*preventing public*

*disorder, protecting children, and promoting traffic safety*), and as stated, affirmed the trial

court's granting of a preliminary injunction. The Court held:

A female-only toplessness ban strikes us as an unnecessary and overbroad means ***to maintain public order and promote traffic safety*** "when more accurate and impartial lines can be drawn." *Morales-Santana*, 137 S. Ct. at 1693 n.13; *see also Craig*, 429 U.S. at 208-09 & n. 22 (striking down a gender-based differential in the age at which men and women could legally buy 3.2% beer because "the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups"). For instance, the City could abate sidewalk confrontations by increasing the penalties for engaging in offensive conduct. And to reduce distracted driving, the City could target billboards designed to draw drivers' eyes from the road. But the City can't impede women's (and not men's) ability to go topless unless it establishes the tight means-ends fit that intermediate scrutiny demands. ***We recognize that ours is the minority viewpoint***. Most other courts, including a recent (split) Seventh Circuit panel, have rejected equal-protection challenges to female-only toplessness bans. . . None of these decisions binds us, though; nor does their sheer volume sway our analysis.

*Free the Nipple—Fort Collins v. City of Fort Collins*, 916 F.3d at 804-805.

Notably, the justifications and reasons for the Fort Collins ordinance (the purported governmental interests) – *preventing public disorder, protecting children, and promoting traffic safety* – are not justifications, reasons, or governmental interests supporting the Ocean City ordinance. Again, consistent with *Biocic*, the Ocean City ordinance was adopted to protect and advance *the public and moral sensibilities* of Ocean City residents and visitors. It is plain that the Tenth Circuit's decision in *Fort Collins* is therefore inapposite here. And in any event, as the Tenth Circuit expressly recognized, cases arising and decided in other jurisdictions are not binding on the Tenth Circuit; likewise, as this Honorable Court has recognized in its prior rulings in this case, the Tenth Circuit's *Fort Collins* ruling is not binding on this Court, especially in light of the binding precedent of *Biocic* and the distinguishing facts and legal context of the *Fort Collins* case (the fact that the local government's justifications for its ordinance are different than in this case). Further, the *Fort Collins* case represents only one judicial decision of many that go the other way on this issue.

In the *Springfield* "Free the Nipple" case, the matter proceeded differently. Although the Court denied the defendant-municipality's Rule 12(b)(6) motion to dismiss in the reported opinion (*Free the Nipple—Springfield Residents Promoting Equality v. City of Springfield*, 153 F.Supp.3d at 1047-48), it expressly declined to address the plaintiffs' motion for a preliminary injunction, which was not ripe at the time. *Free the Nipple—Springfield Residents Promoting Equality v. City of Springfield*, 153 F.Supp.3d at 1047-48, and n. 4. In late 2017, in an unreported opinion, the *Springfield* Court granted summary judgment in favor of the municipality, finding that its ordinance (an ordinance defining indecent exposure as including exposure of the female breast but not including exposure of the male breast) did not violate the Equal Protection Clause. *Free the Nipple—Springfield Residents Promoting Equality v. City of Springfield*, No. 15-3467-

CV-S-BP 2017 WL 6815041, at p. 3 (W.D. Mo. October 4, 2017). In so ruling, the trial court

rejected the same argument being made by the Plaintiffs herein, holding as follows:

> Differing treatment of men and women may implicate the Equal Protection Clause, but "a gender-based classification will be upheld if it bears a fair and substantial relationship to legitimate state ends" or if it "bear[s] a substantial relationship to important governmental objectives." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 468-69 (1981) (quotations omitted); *see also United States v. Virginia*, 518 U.S. 515, 532-34 (1996). "In short, the Equal Protection Clause does not mean that the physiological differences between men and women must be disregarded" so long as those differences are not "a pretext for invidious discrimination," *Michael M.*, 450 U.S. at 481, or based on notions of women's roles, talents or abilities. *E.g., Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692 (2017); *Mississippi Univ. v. Hogan*, 458 U.S. 718, 724-26 (1982). However, classifications predicated on anatomical and biological differences between men and women are generally upheld. *See, e.g., Michael M.*, 450 U.S. at 470-71.
>
> **The City has a legitimate interest in promoting decency and protecting morals by prohibiting public nudity, and this interest constitutes an important governmental objective**. "Public indecency, including nudity, was a crime at common law, and public indecency statutes are clearly within the police power of state and local governments." *SOB, Inc. v. County of Benton*, 317 F.3d 856, 860 (8th Cir. 2003); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-70 (1991) (plurality opinion); *Ways v. City of Lincoln*, 331 F.3d 596, 600 (8th Cir. 2003). Plaintiffs do not dispute this point, but argue that the City's differing treatment of men and women preserves gender stereotypes and constitutes the sexualization of women, so the Equal Protection Clause requires the City to allow men and women to display the very same parts of their bodies.
>
> **However, the Equal Protection Clause has never been interpreted so strictly**. In fact, the Eighth Circuit previously rejected the rigid application of the Equal Protection Clause that Plaintiffs advocate when it decided *Ways v. City of Lincoln*. In *Ways*, the Eighth Circuit addressed a section of the Lincoln Municipal Code that prohibited women (but not men) from showing their "breast(s) with less than a fully opaque covering on any part of the areola and nipple." The prohibition was challenged on a variety of grounds, including as a violation of the Equal Protection Clause. The Eighth Circuit first observed that the ordinance "arguably" did not implicate Equal Protection concerns because the ordinance "was based on a real physical difference between men and women's breasts, thus men and women were not similarly situated for equal protection purposes." *Id.* at 600 n.3. Next, the Court concluded that the ordinance was constitutional even if it drew gender-based distinctions, because it "serve[d] 'important governmental objectives' and ... is 'substantially related to the achievement of those objectives.' " *Id.* at 600 (quoting *United States v. Virginia*, 518 U.S. 515, 532-34 (1996)). The Court of Appeals held that this higher standard of scrutiny was satisfied because "the city's

interests in preventing the secondary adverse effects of public nudity and protecting the order, morality, health, safety, and well-being of the populace are important" and "[t]he ordinance is substantially related to those objectives, and thus the higher standard is satisfied."

*Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Missouri*, No. 15-3467-CV-S-BP, 2017 WL 6815041, at *2 (W.D. Mo. Oct. 4, 2017).

The *Springfield* case was appealed to the Eight Circuit Court of Appeals, which earlier this year affirmed the trial court's ruling in *Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Missouri*, 923 F.3d 508 (8th Cir. 2019). Recognizing that the great majority of Courts considering the matter have upheld the constitutionality of similar ordinances, and "following" its earlier decision in *Ways v. City of Lincoln*, 331 F.3d 596 (8th Cir. 2003), the Eight Circuit held in pertinent part: "Springfield's ordinance is substantially related to its important governmental interests in promoting public decency and proscribing public nudity to protect morals, public order, health, and safety." *Springfield Residents Promoting Equal. v. City of Springfield, Missouri*, 923 F.3d at 512.

### *The Duvallon Case Relied Upon by Plaintiffs*

Plaintiffs have also relied in this case on *Duvallon v. D.C.*, 515 A.2d 724, 728 (D.C. 1986), representing in their preliminary injunction papers that the *Duvallon* Court held that "an adult female baring her breasts in public does not constitute the crime of indecent exposure." Brief in Support of Motion for Preliminary Injunction (ECF Doc. No. 22), at p. 18. This is not an accurate statement of the holding in the *Duvallon* case; which is inapposite here and provides no support for Plaintiffs' position. In *Duvallon*, the Court engaged in statutory interpretation in evaluating whether conduct at issue came within the scope and terms of the subject indecent exposure statute. The Court held in that case: "Our statute refers to the '. . . indecent exposure of *his* or *her* person . . .' (emphasis added). It is the indecent exposure of the comparable portions

of the male and female anatomy that constitutes the crime. In other words, the indecent exposure of human genitalia is the offense. Since Ms. Duvallon did not expose her genitals, she did not violate § 22–1112(a)." *Duvallon v. D.C.*, 515 A.2d at 728. The term "person" was not defined in the subject statute, so the Court analyzed aspects of the common law to arrive at a definition of "person" as including genitalia only (male and female) (and excluding the buttocks and the breast). Under that definition of "person" the Court held that there had been no violation of the subject statute, based on what body parts had been exposed. The issue before the Court in this case – whether an Ordinance expressly prohibiting exposure of the female breast but not prohibiting the exposure of the male breast is constitutional under federal and State equal protection clauses – plainly was not before the *Duvallon* Court and was not considered or decided by the *Duvallon* Court.[5]

## II.  THERE ARE NO MATERIAL FACTS IN DISPUTE, AND OCEAN CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO THE CONSTITUTIONALITY OF THE ORDINANCE.

The undisputed facts as described above make clear that the subject Ordinance promotes and protects the prevailing sensibilities of Ocean City visitors and residents vis-à-vis public exposure of the female breast, as gauged thoughtfully and in good faith by Ocean City's duly elected officials/leaders.

---

[5]     Similarly, *People v. Santorelli*, 80 N.Y.2d 875 (1992), also relied upon by Plaintiffs, does not provide any support for Plaintiffs' stance. Although the defendants in that case, having been arrested for exposure of their breasts under an indecent exposure statute, apparently raised an equal protection argument, the case was not considered or decided on that basis by the majority – as in *Duvallon,* the *Santorelli* Court (the majority), did not address the equal protection argument, and ruled narrowly that the statute as written did not apply to the conduct that had been charged under it. *People v. Santorelli*, 80 N.Y.2d at 877. In the interest of full candor, Defendant notes that, in a concurring opinion in *Santorelli*, Judge Titone did analyze the equal protection issue, advancing sentiments along the lines of Plaintiffs' arguments here.

Legally speaking, Plaintiffs continue to rely on the razor thin reed that the *Fort Collins* case constitutes – a case in which both the trial court and the appellate court admittedly deviated from direct and well-settled precedent throughout so many jurisdictions and struck out in a novel and previously uncharted direction.

The *Fort Collins* case is not only in stark contrast to myriad prior judicial decisions throughout the Circuits, including the Fourth Circuit, but it is in stark contrast to the more recent decision of the Eight Circuit Court of Appeals in the *Springfield* case, upholding and affirming the trial court in Missouri and its decision as a matter of law to grant summary judgment to the municipality, and uphold its ordinance (defining indecent exposure as including exposure of the female breast but not including exposure of the male breast) as constitutional and consistent with the Equal Protection Clause.

Factually speaking, as this Court found in denying the preliminary injunction, "[a]lthough Plaintiffs believe public sensibilities have changed to the point of ready acceptance by the pubic of bare-chested females in public . . . they fail to counter the quite convincing evidence presented by Ocean City to the contrary." Memorandum and Order, ECF Doc. No. 46, at p. 11. Plaintiffs have relied in this case on nothing more than various (hearsay) articles, commentaries, and purported studies, theorizing broadly and esoterically about moral judgments and perceptions, the anatomy and physiology of the human breast, sexual objectification, breast feeding, female and male body image, and psychology. While these materials may well delve into important matters of societal concern, they do not constitute or provide a valid factual or evidentiary basis for Plaintiffs' claims.

Plaintiffs have argued in conclusory fashion that the Ordinance "does not seek to achieve an important governmental interest," but instead "is an unlawful attempt to codify longstanding

sexist ideology."  Brief in Support of Motion for Protective Order, ECF Doc. No. 22, at p. 21. Their support for this assertion, again, is a single case arising in Colorado (the *Fort Collins* case, which strikes out in a completely novel direction and deviates from precedent on the subject) and the self-serving (hearsay) published material referenced in their Complaint, which is not proper, reliable or credible *evidence* supporting their claims.

The Plaintiffs' argument, in essence, is that *any* differing treatment of men and women preserves gender stereotypes and constitutes the sexualization of women, consequently, an ordinance that defines nudity to include exposure of the female breast but to not include exposure of the male breast is impermissible and in contravention of the Equal Protection Clause, as an absolute matter. But as the trial court in the *Springfield* case correctly observed, "**the Equal Protection Clause has never been interpreted so strictly**." *Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Missouri*, No. 15-3467-CV-S-BP, 2017 WL 6815041, at *2 (W.D. Mo. Oct. 4, 2017), *affirmed* 923 F.3d 508 (8th Cir. 2019).

The Plaintiffs have taken an activist stance in this case and are advocating for a dramatic and fundamental *change* to existing law and jurisprudence (which would deviate from Fourth Circuit precedent and the officially-stated view of the Maryland Attorney General). They seek to disrupt the character and moral balance of a historically family-oriented tourist destination, visited and enjoyed by so many people whose expectations and sensibilities do not contemplate and will not tolerate female exposure of the breast in such a densely-populated and family-oriented setting as Ocean City and its beaches. They seek to do so based on nothing more than "cherry-picked" and self-serving (hearsay) published materials discussing a range of loosely related societal topics, and a single case out of Colorado that has no binding effect here.

**III.   THE PURPORTED OPINIONS OF DR. DEBBY HERBENICK ARE
UNRELIABLE, DO NOT WITHSTAND SCRUTINY, LACK PROPER
FOUNDATION, AND ARE INADMISSIBLE UNDER RULE 702; AND,
THEREFORE, DO NOT PROVIDE ANY VALID SUPPORT FOR PLAINTIFFS'
CLAIMS OR BASIS FOR OPPOSING SUMMARY JUDGMENT IN FAVOR OF
DEFENDANT.**

As this Honorable Court found after the preliminary injunction hearing, and based

on Dr. Debby Herbenick's sworn testimony at that hearing, as of December 2018, she

had not "performed any studies regarding the specific sensibilities of Ocean City

residents or visitors," did not base her opinions on any Ocean City-specific demographic

data, and relied instead on her vaguely articulated view/opinion of the sensibilities of

Americans generally, some unspecified studies regarding the female breast and/or nudity

and/or sexuality, and her review of photographs depicting Ocean City beach scenes,

obtained through Google searches.

In her September 9, 2019 deposition, Dr. Herbenick admitted that, since the

December 2018 preliminary injunction hearing: 1) she has not conducted any survey or

study in regard to public sensibilities in either Maryland or Ocean City, on the subject of

female toplessness or bare-chestedness; 2) she has not engaged in any interaction or

discussion or interview with or of any of the Plaintiffs; 3) she has not interviewed anyone

who visits or resides in Ocean City regarding public female toplessness or barechested-

ness; and 4) she has not supplemented her written report in any way. Dr. Herbenick

testified and stated further in deposition that: 1) she has no knowledge of who visits or

resides in Ocean City; 2) she did not review any new or different studies than what she

had reviewed before testifying at the preliminary injunction hearing; 3) although she

reviewed superficially some demographic data about Ocean City, she proffered no

specific way that such data might support her opinions; 4) there are differing views and

sensibilities in society generally, including based on geography, about public female

toplessness; and 5) as far as she is aware, there is no available data or study – either on a

national level or a Maryland-specific level – on societal views toward public female

toplessness. *See* **Exhibit H**, Herbenick Dep. Tr., at pp. 48-58, 67-71, 77-78.

In *Montgomery v. CSX Transport*, 2016 U.S. Dist. LEXIS 131970 (D. Md. 2016),

at pp. *3-4, this Court discussed at some length the standard for reviewing the admissibility

and reliability of proffered expert opinions:

> Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact, and: (1) is "based on sufficient facts or data;" (2) is "the product of reliable principles and methods;" and (3) the principles and methods have been applied "reliably . . . to the facts of the case." *Fed. R. Evid. 702*. The expert testimony also must rest on a reliable foundation and must be relevant. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (extending *Daubert* to "the testimony of . . . other experts who are not scientists"). . . Several factors may be relevant to the Court's determination of reliability, including: (1) whether the expert's theory or technique has been tested, (2) whether it has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique is generally accepted within a relevant scientific community. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). These factors, however, are "neither definitive nor exhaustive, and some may be more pertinent than others depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." *Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 773 (D. Md. 2002). The expert testimony need not be "irrefutable or certainly correct." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006). Because "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," the court's task is not to decide the correctness of the opinion. *Id.* (citation and internal quotation marks omitted). ***However, a conclusory finding that is based upon subjective belief, rather than any valid scientific method or experience, is not reliable, and is thus inadmissible***. *Cooper*, 259 F.3d at 200.
>
> The Court's inquiry into the reliability of an expert's testimony is "flexible," and focuses on "the principles and methodology employed by the expert." *Daubert*, 509 U.S. at 594-95. In determining whether proffered testimony is sufficiently reliable, "the court has broad latitude to consider whatever factors bearing on validity the court finds to be useful; the particular factors will depend on the unique circumstances of the expert testimony involved." *Id.* An expert's "conclusions regarding causation must have a basis in established fact and cannot be premised

on mere suppositions." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). If an expert's testimony is based on assumed facts, those facts "must find some support . . . in the record." *Id*. The Court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury." *Goyal v. Thermage, Inc.*, 2011 U.S. Dist. LEXIS 16666, 2011 WL 691185, at *3 n.8 (D. Md. Feb. 18, 2011) (*quoting Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004)).

As this Court has already held, Dr. Herbenick's opinions are not reliable, persuasive, or relevant "to the issue at hand" in this case. *See* Memorandum and Order, ECF Doc. No. 46, at p. 10.

Indeed, applying the tests as articulated by this Court in *CSX Transport* (and cases cited therein), Dr. Herbenick offers no reliable or credible expert opinions that could properly assist a factfinder – she has conducted no study, survey, or analysis of any kind on the subject of sensibilities toward public nudity in Ocean City (or anywhere else); she has conducted no interview of any Ocean City resident(s) or visitor(s) or official(s) on the subject; she has done virtually nothing, at all, to reach any finding or conclusion as to the sensibilities of Ocean City visitors and/or residents on the matter at hand; she has admitted the absence of any data or studies developed by anyone else directly related to the relevant question; she has admitted variations in sensibilities as to public nudity among people in different geographic locations, i.e., that the sensibilities of Ocean City visitors and residents may differ from the sensibilities of persons living in or visiting other locations or States or cities; and she advances no direct or collateral challenge of any kind to the Ocean City Mayor and Council's determination of public sensibilities in Ocean City, as reflected in the ordinance and as articulated by Defendant's witnesses in sworn testimony. Dr. Herbenick's proffered "opinions" are not admissible under Rule 702, are not credible or reliable, are not relevant or probative, and should not bear in any way on Defendant's summary judgment motion or the case generally.

## CONCLUSION

WHEREFORE, Defendant respectfully requests that this Honorable Court grant summary judgment in Defendant's favor and against Plaintiff, as to all of Plaintiffs' claims.

Respectfully submitted,

By:     **/s/ Bruce F. Bright**
Bruce F. Bright (Bar No. 27236)
Ayres, Jenkins, Gordy & Almand, P.A.
6200 Coastal Highway, Suite 200
Ocean City, Maryland 21842
Tel: 410-723-1400
Fax: 410-723-1861
E-mail: bbright@ajgalaw.com
*Attorneys for Defendant Town of Ocean City*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 20th day of December, 2019, a copy of the foregoing Defendant Town of Ocean City, Maryland's Memorandum in Support of Motion for Summary Judgment (with Exhibits A-H) was filed electronically through the Court's Electronic Case Management and Filing System. All parties to this case are able to access the filing through this system.

**/s/ Bruce F. Bright**
Bruce F. Bright